# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00003-CV

**Texas Department of Assistive and Rehabilitative Services
f/k/a Texas Rehabilitation Commission, Appellant**

**v.**

**Anna M. Abraham, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT
## NO. GN303143, HONORABLE DARLENE BYRNE, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This is an appeal from a jury's award of damages in a retaliatory discharge case. Anna M. Abraham sued her employer, the Texas Rehabilitation Commission (TRC),[1] alleging that she was unlawfully terminated after complaining of sexual harassment by her boss. *See* Tex. Lab. Code Ann. § 21.055 (West 1996). A jury found in favor of Abraham and awarded her damages and reasonable attorney's fees and expenses. The TRC appeals this judgment contending that there was legally insufficient evidence that Abraham was engaged in a protected activity or that there was any causal link between that activity and her job loss, and that there was error in the jury charge. We affirm the judgment.

---

[1] The TRC no longer exists as an independent entity. It recently became part of a new state agency, the Texas Department of Assistive and Rehabilitative Services. Because all of the events in this case occurred before the TRC was reorganized, we will refer to appellant as "the TRC."

## BACKGROUND

Anna Abraham was discharged from her position as an auditor in the TRC's Management Audit Division within weeks of making an internal sexual harassment complaint against her supervisor. There had been considerable upheaval in the audit division during the months preceding Abraham's discharge. Audit division employees had been criticized for unprofessional behavior, and management was investigating the general operations of the division and the alleged misconduct by its new head, Jim Gilger. Because the TRC challenges the legal sufficiency of the evidence supporting the jury's verdict, we will discuss the events leading up to Abraham's discharge in detail.

Abraham began working at the TRC in 1991. At trial, she was described by Commissioner Vernon "Max" Arrell as an excellent employee. A "Performance Appraisal/Development Plan" for the period of October 1999 to January 2001 concluded that Abraham "exceeds" twelve of the fourteen performance standards and "meets" the remaining two. The month before she lost her job, Gilger recommended, and Arrell approved, an immediate merit pay increase for Abraham.[2]

---

[2] Gilger's memo to Arrell requesting the merit pay increase stated:

> Ms. Abraham's recent Performance Appraisal demonstrates she meets or exceeds all her job standards and continues to perform at a high level. She communicates effectively with clients, Division managers, and co-workers. I have observed evidence that she develops and maintains professional relationships, including liaison activities, with clients to promote teamwork, effective rapport, and cooperation. She communicates in an articulate and professional manner, and her writing is clear, concise, and constructive.
>
> Ms. Abraham is a valuable member of the Management Audit staff and her continued growth will be critical to the success of the department.

Gilger was hired as the audit division's director in December 2001. Audit division employees described Gilger as a "touchy-feely" boss who acted inappropriately around women. Rumors circulated that he had been charged with sexual harassment at his prior workplace. Commissioner Arrell confirmed that a complaint had been filed against him at the University of Texas at El Paso and sent Gilger a warning on May 1, 2002, that "[a]ny confirmed allegations of inappropriate behavior or sexual harassment will result in your immediate termination."

Later that month, one of Abraham's co-workers, Carolyn Briggs, made a sexual harassment complaint against Gilger to the TRC's Office of Civil Rights. Jenny Hall, the director of that office, immediately informed Arrell of Briggs's complaint. Arrell asked Hall to investigate, and the entire audit division was interviewed about the alleged misconduct.

Hall interviewed Abraham on June 3. During the interview, Hall promised Abraham that there would be no retaliation against her for participating candidly in the inquiry. Abraham acknowledged that she knew Briggs was uncomfortable around Gilger and that Gilger's behavior toward other women in the office was inappropriate. She explained that Gilger was a "toucher" who would sometimes put his arm around female employees to draw them closer during a conversation. Abraham told Hall that she often stepped away when she felt he was too close, but that Gilger typically stepped forward to close the gap between them. When Abraham asked whether this behavior constituted sexual harassment, Hall explained that it could if it made Abraham uncomfortable.

The day after the interviews concluded, Arrell called a meeting with all audit division employees on June 5; his chief of staff, Mary Wolfe, and Jenny Hall also attended. It was unusual,

3

if not unprecedented, for the head of the agency and two other managers to meet with the audit division staff as a group. Roxanne Rios, an auditor who attended, testified that Arrell was angry:

> [Arrell] said that he was tired of us all walking around and complaining, and we needed to put our noses to the grindstone and get back to work. He was tired of all the trouble that we were causing. And he said, 'I could outsource the whole lot of you.' And, you know, he pounded the table and said, 'And this is not a threat.'[3]

Rios testified that she felt threatened and thought that her job was on the line.

Abraham and two other audit division employees did not attend the June 5 meeting because they were out of the office that day. When they returned to work on June 6, Arrell summoned Abraham, Christina Alvarado and Jack Mezzetti to a meeting. Alvarado testified that Arrell was angry and that he pounded the table, much as he was described to have done the day before. Abraham testified that Arrell's "message was he didn't want to have to deal with any more problems in our department or he would get rid of us all. He was threatening to fire us." Mezzetti testified, "It was real, real clear to me what [Arrell] was talking about. . . . [I]t was because of the timing of the meeting. The meeting was right about the time of the sexual complaints." Alvarado testified that, after the meeting, she was "very worried" about the information she had given Hall during their interview.

Hall acknowledged that she attended both meetings "because we were involved in a sexual harassment complaint." However, Hall testified that the meetings were unrelated to those

---

[3] At trial, Arrell acknowledged that he remembered telling the audit division employees that "I would contract it out," but later testified that he "did not say I would. I said I could if it didn't shape up." Arrell also testified that he remembered saying that he could "recommend" such action.

4

complaints. Arrell explained that the purpose of the early June meetings was to direct audit division staff members to "quit gossiping and carrying on and doing the things they were doing down there."[4]

On June 7, Abraham filed a grievance with the TRC's Office of Civil Rights, alleging sexual harassment and retaliation by Gilger. Abraham's grievance explained that Gilger had asked Abraham to spend time alone with him outside of the office, repeatedly inviting her to play racquetball, occasionally inviting her to have drinks after work, and once inviting her to have dinner at his home. Abraham wrote that Gilger suggested that there must be somewhere the two of them could have a drink "without being seen by anyone at the office," and that he "bemoaned the fact that we couldn't go for a drink . . . which made [Abraham] very uncomfortable." Hall notified Arrell and Wolfe as soon as she received Abraham's grievance.

On June 14, Hall concluded her investigation into Briggs's earlier allegations, finding "sufficient evidence to support that Mr. Gilger's behavior" created "an intimidating, hostile or offensive work environment." After reviewing the report of Hall's investigation and discussing Gilger's conduct with at least one member of the TRC Board of Directors, Arrell fired Gilger.

While Hall began to investigate Abraham's complaint of Gilger's sexual harassment, Arrell asked Wolfe to undertake a "management assessment" of the audit division. Arrell testified that he had some general concerns about the entire division and asked Wolfe to

---

[4] It appears clear from the record that the atmosphere in the office was often tense; several of the audit division employees did not get along with one another. For example, Briggs brought her pet birds to the office, angering Abraham, who complained to management that the birds were a health hazard. Abraham described the office as a "rumor mill" where members of the small staff frequently gossiped about one another. She attributed the workplace problems to a lack of management, while Arrell blamed the employees for acting like "junior high kids." Hall described the office as "a rather unhealthy place" plagued by "a lot of bickering."

> [g]o down and take a look at management audit or any other division and find out whether or not—how it's operating. Find out the—what the workload is. Find out what the staffing is. And then give me a determination as to what—what's needed down there.

Arrell testified that he wanted Hall to conduct her sexual harassment investigation separately from Wolfe's management assessment. He instructed Hall and Wolfe not to share information unless, for example, "management found [something] that had to do with civil rights," or vice-versa.

The record indicates that Hall shared information with Wolfe and Arrell on a frequent basis. For example, Hall forwarded Abraham's grievance to Wolfe and Arrell immediately upon receipt. Hall also forwarded a summary of a telephone conversation in which Gilger told Hall that Briggs and Abraham were conspiring against him and that they were "lazy," "dysfunctional" employees.[5] In addition, Hall provided Arrell and Wolfe with advance copies of her report:

> because, one, I knew . . . a board meeting was coming. Two, I know they were working on issues regarding management audit. So it wasn't a decision kind of sharing. It was an informational sharing with the executive management of the agency.

Wolfe's management assessment focused on personnel issues within the office and the office's workload. According to Arrell, the auditors were authorized to work only on audits listed on the Annual Audit Plan; work on other projects was strictly forbidden. Wolfe testified that she

---

[5] Hall's notes also stated that Gilger "said that Carolyn [Briggs] and Anna [Abraham] have taken very innocent facts and circumstances and events and put a completely different perspective on it and if anything, he feels he should be complaining about a hostile work environment and not them."

discovered that audit division employees had been working on unapproved audits.[6] Wolfe concluded that there was insufficient work on the Annual Audit Plan to sustain the office's current number of employees.

Abraham disputed this conclusion at trial, presenting evidence that there was sufficient work in the audit division. She alleged that Gilger had planned to ask the Board of Directors to add certain audits to the Annual Audit Plan at its next meeting. She also presented evidence that Arrell had approved the posting of two new job vacancies in the audit division on May 28—less than a month before Wolfe told the Board that there was insufficient work. Moreover, other audit division employees testified that there was plenty of work to keep the staff busy.

The TRC Board met on June 20. The agenda of the closed executive session included Wolfe and Arrell's report on Gilger. Wolfe first testified that she updated the Board "regarding everything I had found about Mr. Gilger," including employee concerns about his "management style." She later testified that she failed to tell the Board that "Jim Gilger had been fired for sexually harassing staffers in his office." The second item on the executive session agenda was listed as "Management Audit/RIF." Wolfe presented the findings of her management assessment at this time, informing the Board that "there were more people than there were work products."

---

[6] Evidence that Arrell and Wolfe received regular e-mails and memoranda from Gilger summarizing the work being done by the audit division contradicted Wolfe's assertion that she first discovered the unapproved audits in the course of her investigation. Gilger's updates included projects not listed on the audit plan. E-mails from both Wolfe and Arrell confirm that they had requested and reviewed these updates, hence they were aware of the unapproved audits long before Wolfe's management assessment.

After Wolfe left the executive session, Arrell recommended that the Board eliminate unfilled positions and terminate four employees as part of a "reduction in force" (RIF).[7] The Board approved the "Reduction in Force Authorization and Implementation Plan" (RIF Plan) as proposed. Two of the four employees identified for termination, Abraham and Briggs, had filed grievances against Gilger. After the approved RIF Plan, only four auditors and one administrative technician remained on staff.

Abraham established at trial that the TRC did not follow its own guidelines for determining which positions to eliminate under the RIF. Those guidelines required temporary and probationary employees to be fired first, followed by "regular employees with less than two years total TRC service." If more cuts were needed, regular employees with more than two years of employment would be fired "based on current (prior twelve months) performance."

Arrell explained that, as the director of the audit division, Gilger was the logical person to have evaluated the employees. But because Gilger had been fired the week before, there was no one who could rank employee performance. In light of these circumstances, the RIF Plan relied solely on "tenure with TRC" to terminate employees.

On June 27, a week after the Board approved the RIF Plan, Arrell informed Abraham and the other affected employees that they had been fired "[a]fter careful and thorough review of

---

[7] TRC guidelines stated:

Factors that may require reductions in TRC staffing include budgetary constraints, program curtailments or consolidation, or deletion of functions. When such situations exist, every effort is made to accomplish needed reductions through attrition. However, if the required reduction cannot be accomplished through attrition, it may become necessary to separate employees through reduction in force (RIF).

management audit staffing and work responsibilities and to ensure the most prudent use of resources . . . ." Abraham filed a Charge of Discrimination with the Texas Commission on Human Rights (TCHR). The TCHR referred the complaint to the Equal Employment Opportunity Commission (EEOC). After an investigation, the EEOC found reasonable cause to believe unlawful retaliation had occurred. Abraham filed this lawsuit in August 2003, alleging that she was fired in retaliation for engaging in protected conduct, in violation of section 21.055 of the labor code. *See id.* The jury found in favor of Abraham, and she was awarded $222,843.08 in lost pay and retirement benefits; $25,000 in compensatory damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary damages; and reasonable attorney's fees and expenses.

## DISCUSSION

On appeal, the TRC challenges the legal sufficiency of the evidence and contends that the jury was improperly instructed. In its first two points of error, the TRC asserts that Abraham adduced no evidence that: (1) Abraham took part in an activity protected under section 21.055 of the labor code or that (2) the TRC Board knew that she had done so before she was fired. *See id.* In its third point of error, the TRC alleges that the district court erred by adopting what it terms a "motivating factor" jury instruction, rather than a "but for" jury instruction.

**Legal Sufficiency of the Evidence**

The TRC's legal sufficiency challenge is limited to two issues: Abraham produced legally insufficient evidence that (1) she engaged in a protected activity and (2) the TRC Board was aware of Abraham's participation in the alleged protected activity when it approved the elimination of her job. We will evaluate the TRC's legal sufficiency claims in light of the supreme court's recent

9

statement of the law in *City of Keller v. Wilson*, 168 S.W.3d 802 (Tex. 2005). We will sustain a legal sufficiency point if the record reveals: (a) the complete absence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact. *Id.* at 810 (citing Robert W. Calvert, *"No Evidence" & "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362-63 (1960)). The final test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *See id.* at 827.

When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is less than a scintilla and, in legal effect, is no evidence. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (citing *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)). But, more than a scintilla of evidence exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Ford Motor Co.*, 135 S.W.3d at 601 (citing *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)).

Under the *City of Keller* analytical framework, we review the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *See* 168 S.W.3d at 807. Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony. *Id.* at 819. When there is conflicting evidence, it is the province of the jury to resolve such conflicts. *Id.* at 820. If conflicting inferences can be drawn from the evidence, we assume jurors made all inferences in favor of their verdict if reasonable minds could, and disregard all other inferences. *Id.* at 821. But if the

10

evidence allows only one inference, we may not disregard it. *See id*. So long as the evidence falls within a zone of reasonable disagreement, we may not substitute our judgment for that of the trier-of-fact. *See id.* at 822.

*Protected Activity*

TRC first contends that Abraham failed to show that she engaged in a legally protected activity under section 21.055 of the labor code before she was fired. *See Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 414 (5th Cir. 2003) (retaliation plaintiff must demonstrate (1) she engaged in protected activity, (2) adverse employment action occurred, and (3) causal link between protected activity and adverse employment action); *Mayberry v. Texas Dep't of Agric.*, 948 S.W.2d 312, 315 (Tex. App.—Austin 1997, writ denied). Section 21.055 provides:

> An employer, labor union, or employment agency commits an unlawful employment practice if the employer, labor union, or employment agency retaliates or discriminates against a person who, under this chapter: (1) opposes a discriminatory practice; (2) makes or files a charge; (3) files a complaint; or (4) testifies, assists, or participates in any manner in an investigation, proceeding, or hearing.

Tex. Lab. Code Ann. § 21.055.

The TRC argues that Abraham's internal grievance and her participation in the investigation of Briggs's complaint did not constitute protected activities as defined in the "participation clause" of the statute. *See id*. § 21.055(2)-(4). In support of this position, the TRC draws our attention to the Eleventh Circuit's opinion in *Equal Employment Opportunity Commission v. Total System Services, Inc.*, 221 F.3d 1171 (11th Cir. 2000). That case holds that the "participation clause" of the federal analogue to section 21.055 protects only "proceedings and

11

activities which occur in conjunction with or after the filing of a formal charge with the EEOC," and not those who participate in an employer's "internal, in-house investigation, conducted apart from a formal charge with the EEOC." *Total Sys. Servs., Inc.*, 221 F.3d at 1174. According to the TRC, neither Abraham's participation in Hall's internal investigation, nor Abraham's filing of a grievance with the TRC's Office of Civil Rights, would be covered under the "participation clause" of the statute.

However, the Texas statute has not been so narrowly construed. In *Wal-Mart Stores, Inc. v. Lane*, the Corpus Christi Court of Appeals reversed a jury verdict finding retaliation, but held that an informal, internal complaint of sexual harassment to a supervisor was a protected "complaint" for the purposes of section 21.055(3) of the labor code. *See* 31 S.W.3d 282, 296 (Tex. App.—Corpus Christi 2000, pet. denied). Lane, a Wal-Mart employee, informed his supervisor that a female co-worker had been spreading rumors that he had sexually harassed her. *See id*. at 287. After an investigation into his conduct, Lane was terminated. *See id*. Lane filed suit against Wal-Mart and obtained a substantial damage award. *See id*. Among other claims, Lane alleged that he was fired in retaliation for reporting the alleged sexual harassment by his co-worker. *See id*. at 295. On appeal, the Corpus Christi court specifically addressed Wal-Mart's contention that Lane's internal complaint was not a "statutorily protected activity," and held that Lane had made a complaint pursuant to section 21.055(3) of the labor code. *Id*. at 296; Tex. Lab. Code Ann. § 21.055(3) (retaliation prohibited against person who "files a complaint").

Abraham made an internal complaint of sexual harassment that was considerably more formal than the one in *Lane*—she filed her grievance in writing with the agency's Office of

12

Civil Rights. Finding *Lane* persuasive, we hold that Abraham's conduct was a protected activity under the participation clause. *See Lane*, 31 S.W.3d at 296.

Additionally, there is ample evidence in the record that Abraham opposed a discriminatory practice under section 21.055(1). *See* Tex. Lab. Code Ann. § 21.055. To establish opposition to a discriminatory practice, an employee must first demonstrate a "good faith reasonable belief that the underlying discriminatory practice of the employer violated the law." *Cox & Smith Inc. v. Cook*, 974 S.W.2d 217, 224 (Tex. App.—San Antonio 1998, pet. denied). The employee does not have to show the actual existence of an unlawful practice; it is sufficient that she had a good faith reasonable belief that the employer's conduct was unlawful under the Texas Commission on Human Rights Act. *See id.* The employee must also "demonstrate that she reported the challenged activity to the employer." *Id.*

Two key facts from the record support Abraham's good faith reasonable belief that Gilger's conduct was illegal: (1) Hall, the TRC's own civil rights investigator, told Abraham that Gilger's conduct "could be" sexual harassment if it made her uncomfortable, and (2) Abraham knew that the TRC ultimately fired Gilger for similar conduct directed at another female employee. Because the TRC believed that Gilger's conduct was illegal, it was reasonable for Abraham to form the same belief. The evidence is also clear that Abraham reported Gilger's conduct to the TRC both during her interview with Hall and two days later when she filed a formal grievance with the TRC's Office of Civil Rights. We hold that Abraham opposed a discriminatory practice under section 21.055 of the labor code. *See* Tex. Lab. Code Ann. § 21.055; *Cox*, 974 S.W.2d at 224.

Applying the court's decision in *Lane* to the instant case and reviewing the evidence of Abraham's opposition to Gilger's sexual harassment, we hold that she adduced legally sufficient

13

evidence that she engaged in activity protected by section 21.055. *See* Tex. Lab. Code Ann. § 21.055.[8] We overrule TRC's challenge to legally sufficient evidence of a protected activity.

*Causal Link*

In its second issue, the TRC contends that there is no evidence of a causal link between Abraham's protected activity and the loss of her job because Abraham did not demonstrate that the TRC Board was aware of her complaint before it approved the RIF Plan. *See Fabela*, 329 F.3d at 414; *Marsaglia v. University of Tex., El Paso*, 22 S.W.3d 1, 4 (Tex. App.—El Paso 1999, pet. denied). It is well established that the focus of our causal link analysis is on the final decisionmaker. *Ackel v. Nat'l Communications, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003).

The TRC urges us to overturn the jury's verdict because it claims that Abraham did not prove that the TRC Board, the final decisionmaker in Abraham's termination, ever knew of

---

[8] According to the TRC, a new trial is required because it is impossible to determine whether the jury premised liability on Abraham's opposition to a discriminatory practice or participation in a protected activity. We are required to order a new trial under *Crown Life Insurance Co. v. Casteel* when "a single broad-form liability question incorporate[s] multiple theories of liability" in such a way that we "cannot determine whether the jury based its verdict on an improperly submitted invalid theory." *See* 22 S.W.3d 378, 388 (Tex. 2000). Although the first jury question in this case included multiple legal theories, they were proper, making it unnecessary for us to inquire into which theory formed the basis for liability.

Even had the district court erred by including a participation theory of liability in the first jury question, we hold that such error was harmless. The error of including a factually unsupported claim in a broad-form jury question is not always reversible. *Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 227 (Tex. 2005). To be reversible, the erroneous instruction must have "probably prevented the appellant from properly presenting the case to the court of appeals." *See id.*; Tex. R. App. P. 44.1(a)(2). Here, the underlying conduct upon which the jury found liability was the same, whether characterized as participation or opposition. On this record, we are "reasonably certain that the jury was not significantly influenced by issues erroneously submitted to it." *See Romero*, 166 S.W.3d at 227-28. Consequently, we find that any error in the jury instruction was harmless.

Abraham's protected activities. According to the TRC, the Board considered only two sources of information in approving the RIF: Wolfe's management assessment and Arrell's recommendation to fire Abraham. Neither of those, the TRC contends, establishes the Board's knowledge of Abraham's protected activity.

However, Abraham presented strong circumstantial evidence that the TRC Board was aware of her protected activity. Hall testified that she provided advance copies of a draft of her report on Gilger's sexual misconduct to both Arrell and Wolfe on June 14, prior to their meeting with the Board. The first paragraph of that report states that Abraham had filed an internal grievance against Gilger. Abraham's grievance form and a four-page statement in which Abraham described Gilger's behavior were also attached to Hall's report. Hall testified that she provided the report to Wolfe and Arrell so that the information could be given to the Board: "I wanted to share information with executive management because one, I knew a board meeting was coming . . . ."

Arrell testified that he consulted with the Board before firing Gilger on June 14. He explained that the "[B]oard and I together decided that he needed to go" and that the Board "gave me the authority to fire him." According to Gilger's notice of termination, Arrell and the Board based their decision to fire Gilger in large part upon "confirmed allegations of sexual harassment and inappropriate behavior. . . ." Gilger's name is also listed as a topic of discussion for executive session at the June 20 board meeting—the same meeting in which the Board decided to eliminate Abraham's job. Arrell, who was fully aware of Abraham's complaints, was present while the Board deliberated on his recommended reduction in force.[9] Wolfe testified that she relayed concerns about

---

[9] Arrell testified at trial that he could not recall the events of the June 20 board meeting in detail.

15

Gilger's "management style" to the Board. Although Wolfe claimed that she did not tell the Board that Gilger had been fired for sexual harassment, this answer does not address whether Wolfe mentioned Abraham's complaint. Moreover, there is no doubt that the Board knew Gilger had been fired for sexual harassment—the Board had authorized his termination. The jury could have reasonably inferred from this record that the Board was informed of the details of Hall's report, including Abraham's complaint, before it terminated Gilger and eliminated Abraham's position. Because there is some evidence that the Board was aware of Abraham's protected activity prior to eliminating her position, we overrule the TRC's second legal sufficiency challenge.[10]

**Jury Instructions**

In its third and final point of error, the TRC contends that the district court erred by submitting a "motivating factor" jury instruction rather than a "but for" jury instruction. We review the TRC's claim under an abuse of discretion standard. *See In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000). The trial court has great latitude and considerable discretion to determine necessary and proper jury instructions. *Louisiana-Pacific Co. v. Knighten*, 976 S.W.2d 674, 676 (Tex. 1988). Error in the jury charge is reversible if, when viewed in light of all the circumstances, it amounts to such a denial of rights of the complaining party as was reasonably calculated and probably did cause the rendition of an improper judgment. *Niemeyer v. Tana Oil & Gas Co.*, 39 S.W.3d 380, 387 (Tex. App.—Austin 2001, pet. denied) (*citing Howell Crude Oil Co. v. Donna Refinery Partners, Ltd.*, 928 S.W.2d 100, 110 (Tex. App.—Houston [14th Dist.] 1996, writ denied)).

---

[10] Because we hold that Abraham presented legally sufficient evidence that the Board was aware of her protected activity, we need not consider Abraham's "conduit theory" argument. *See City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 70 (Tex. 2000).

The district court charged the jury with the following two questions:

**Question No. 1**

Was Anna M. Abraham's filing a complaint; testifying, assisting, or participating in any manner in a sexual harassment investigation; or opposing sexual harassment a motivating factor in the Texas Rehabilitation Commission's decision to discharge Anna M. Abraham?

A 'motivating factor' in an employment decision is a reason for making the decision at the time it was made. There may be more than one motivating factor for an employment decision.

Answer "Yes" or "No."

Answer: _____

If you have answered "Yes" to Question No. 1, then answer the following question. Otherwise, do not answer the following Question.

**Question No. 2**

Would the Texas Rehabilitation Commission have discharged Anna M. Abraham when it did, in the absence of the impermissible motivating factor(s) described in Question No. 1?

Answer "Yes" or "No."

Answer: _____

The TRC contends that the district court erroneously submitted the two "motivating factor" instructions. The proper causation standard for retaliation claims under section 21.055 of the labor code is, as the TRC asserts, ultimately a "but for" standard. *See Pineda v. United Parcel Serv., Inc.*, 360 F.3d 483, 487 (5th Cir. 2004); *Thomann v. Lakes Reg'l MHMR Ctr.*, 162 S.W.3d 788, 799

17

(Tex. App.—Dallas 2005, no pet.).[11] But the mere mention of the phrase "motivating factor" in the first question does not convert the two instructions, considered together, into an improper instruction. The first question required the jury to determine whether one of the TRC's reasons for firing Abraham, among others, was that she engaged in a protected activity. The second question then required the jury to determine whether Abraham would have lost her job when she did if she had not engaged in that protected activity.

In *Department of Human Services v. Hinds*, a case brought under the Whistleblower Act, the court found that an employee is not required "to prove that his reporting illegal conduct was the sole reason for his employer's adverse actions." *See* 904 S.W.2d 629, 634 (Tex. 1995). Thus, the fact that there may have been additional, permissible factors that motivated the TRC to terminate Abraham is irrelevant under *Hinds* if Abraham would not have lost her job when she did but for the impermissible factor. *See id*. at 636 ("the standard of causation in whistleblower and similar cases should be that the employee's protected conduct must be such that, without it, the employer's prohibited conduct would not have occurred when it did"). Even if the first jury question raised the possibility that there may have been permissible reasons for Abraham's termination, the second question made certain that the jury would not be able to assign liability on that basis. Instead, the second question imposed the "but for" standard by requiring the jury to find liability only if Abraham would not have lost her job in the absence of an *impermissible* reason for her termination. *See id*. Accordingly, we overrule the TRC's third issue.

---

[11] The standard is considerably less stringent to establish the causal link in making a prima facie case of retaliation. *See Ackel v. Nat'l Communications, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003).

18

## CONCLUSION

Having overruled all of the TRC's issues, we affirm the district court's judgment based on the jury's verdict.

_____   _____

Bea Ann Smith, Justice

Before Chief Justice Law, Justices B. A. Smith and Pemberton

Affirmed

Filed:   January 27, 2006