COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-06-326-CV

IN THE INTEREST OF C.S., A.K.A. 

C.R. AND C.S., THE CHILDREN

------------

FROM THE 158TH DISTRICT COURT OF DENTON COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

In one issue, appellant Brooke R. complains that the trial court erred by refusing to allow her to ask two questions during voir dire.  We affirm.

BACKGROUND

In 2006, Appellant went before a jury on the State’s petition to terminate her parental rights to C.R. and C.S.  Appellant, age twenty-four at trial, had been in and out of jail on drug charges since 2003.  She was charged with child endangerment in 2005 when she fell asleep in a motel room and C.S., then age two, left the room and was found near Highway 121.  She pled guilty and was convicted of that offense.  She used drugs while pregnant with each child. When C.R. tested positive for methamphetamine at birth, Child Protective Services (“CPS”) removed the children.  She did not complete her service plan and continued to use drugs after the children’s removal.

The jury found, by clear and convincing evidence, that she had knowingly placed or knowingly allowed C.S. and C.R. to remain in conditions or surroundings that endangered their physical or emotional well-being, engaged in conduct that endangered C.S.’s and C.R.’s physical or emotional well-being, failed to comply with the provisions of the court order that specifically established the actions necessary for C.S. and C.R. to be returned to her when the children had been in the State’s care for not less than nine months after their removal from her, and that termination of her parental rights to both children was in the children’s best interests.  
See
 
Tex. Fam. Code Ann. 
§ 161.001(1)(D), (E), (O), (2) (Vernon Supp. 2006).  The trial court approved the jury’s findings and incorporated them into the termination order.

VOIR DIRE

Appellant argues that the trial court erred by refusing to allow her “to ask proper voir dire questions which went to the heart of her case.”
(footnote: 2)
Standard Of Review

We review a trial court’s voir dire rulings for an abuse of discretion
.  See Hyundai Motor Co. v. Vasquez
, 189 S.W.3d 743, 753 (Tex. 2006).  To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable.  
Downer v. Aquamarine Operators, Inc.
, 701 S.W.2d 238, 241-42 (Tex. 1985), 
cert. denied
, 476 U.S. 1159 (1986).  Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred.  
Id
.  A trial court abuses its discretion if its denial of a proper question prevents a party from determining whether a venireperson is subject to a challenge for cause.  
Babcock v. Nw. Mem’l Hosp
., 767 S.W.2d 705, 709 (Tex. 1989).  To obtain a reversal, the complaining party must show both that the trial court abused its discretion and that the error probably caused rendition of an improper judgment.  
Tex. R. App. P
. 44.1(a)(1); 
Romero v. KPH Consolidation, Inc
., 166 S.W.3d 212, 225 (Tex. 2005).

Voir Dire Questions

Appellant complains that she was prevented from exploring the issues of (1) whether the panel believed that, all things being equal, a permanent foster family was superior or inferior to a temporary placement with relatives, and (2) how many foster children in a given foster home would be a “good number.” She contends that neither question called for “contracting” with the jury and that the trial court’s rulings prevented her from exploring the panel’s feelings with regard to the case’s central issue: whether it was in the children’s best interests to terminate Appellant’s rights and place the children with a foster family.

Voir Dire

During voir dire, the State asked questions about CPS, the removal process, service plans and treatment, the burden of proof and statutory grounds for termination, and whether the members of the venire panel felt that they could terminate someone’s parental rights.  Appellant also asked questions about the burden of proof and statutory grounds, as well as options for child placement before termination, i.e., removal to relatives who could temporarily take the child versus permanent foster care.

Questions 1 and 2, addressed below, were not the only voir dire questions objected to on the basis of contracting or commitment.  Appellant objected twice on the basis of “improper commitment” to the State’s questions about whether the venire panel could terminate someone’s parental rights if the case did not involve severe abuse and whether they could not terminate someone for failing to comply with the service plan.  The trial court warned the State to stay away from commitment after the first objection, but stated that it considered the question on the second topic to be “philosophical . . ., not contractual,” and overruled that objection.

The State’s first objection on the basis of contracting was to Appellant’s question on whether the venire panel would be able to give the testimony of a witness with a drug or alcohol problem as much weight.
(footnote: 3)  The State objected and the trial court warned Appellant, “Stay away from trying to contract.”  After the trial court sustained the State’s objection to Question 1, the State objected to Appellant’s question regarding whether, if the child had been returned to the parent for six months of monitoring as a last chance, “[d]o you believe that that could influence your decision as to whether or not the [State] has done all that it can do to try and reunite the family?”  The trial court indicated that it did not think this was contracting.  The State also objected, on the basis of contracting on a nonessential issue, to the question, “Do you think that it would have been better for [Appellant] to have an attorney appointed at the very beginning of this case instead of at the end?”  The trial court stated that it thought this was an improper question.  Finally, with regard to a question about, if there were a guilty plea to some of the termination charges, whether that was all someone would consider, the State objected on the basis of contracting.  The trial court overruled this objection, stating that it did not think that was contracting.

The State also objected to Appellant’s misstatement of the law and evidence with regard to termination of “relatives’ rights” and to Appellant making reference to what the State had or had not done with regard to reunification during voir dire.  The trial court sustained these objections.

Question 1

With regard to Question 1, Appellant began the discussion by asking the venire panel, with regard to the initial removal process, “Now, the question that we have is[,] where does that removal go to?  If the parents are in a situation where they are not the first option, who is the second option?  Anybody have any preferences who the second option would be?”  After the venire panel responded, “relatives,” Appellant followed up with, “So everyone believes that the relatives should be looked at as much as possible?”  The venire panel responded, “yes.”  Appellant then asked, “Would y’all agree that maybe you could sacrifice a little bit of permanence in order to place the children with a relative?  Front row.”

Appellant then spurred considerable discussion among the members of the venire panel with the following questions:

So you believe that if a relative says, you know, I can’t make a permanent commitment, that they should be considered for placement and the children should go to foster care?

If they can’t commit to say I’m going to do this permanently, do you think that should necessitate a foster home removal?  Or you should try and place them with a relative?

So if the relatives can say, hey, I can watch them temporarily.  I am not going to commit to adopt them if their rights are terminated.  But I will watch them temporarily while the parents work on their plan.  Do you think that CPS, CASA, and all those people, do you think they should try and place them with a relative or go with foster care and possibly adopt them from the very beginning? 

But if the relative doesn’t want to make a commitment to adopt at the very first day, should the [State] make the decision to try and have just temporary placement with the relative?

[T]he decision is, at the initial removal, should the children be completely uprooted or should they be placed with a relative[?]

What we are talking about, though, is that during the interim period, should CPS and the people, the [State], that are making the decisions, should they be looking more towards a relative placement or a placement with a foster family[?]  And if the relative can only make a temporary commitment, is that better than placing him with a foster family that can make a permanent commitment[?] 

If both are good houses; however, the relative says, hey, man, I don’t want to jump off the boat for an adoption at this moment.  I have the utmost faith that the other people will get there, you know, will get to the end point where they need to be.  Or should the first option be for the [State] to place them with the foster parent who’s willing to adopt.

Is it better to have the children placed in the initial removal, when the kids are first taken away from the parents on day one, is it better for the [State] to place them with a relative who can make a temporary commitment, or is it better to place them in a foster home that can make a permanent commitment to try and adopt[?] 

Finally, in Question 1, Appellant reiterated,

Now, at the very beginning, you have your temporary hearings.  And when the children are removed, the decision has to be made where the children are going to stay pending the final outcome.  
And the question is[,] you have two equal households.  Is it better to be with a foster parent who’s willing to adopt, make that commitment?  Or to stay with a relative to keep them within the family unit, even though they can’t make the guarantee that they will adopt at the end of the permanency hearing?
  [Emphasis added.]

The venirepersons responded,

Eades: Can’t they stay with the relative without being adopted? . . . I don’t understand why they have to say they are going to adopt them on the front end.

Appellant responded, “If there is a question that there wasn’t a commitment for permanency, do you believe that—let’s start with Ms. Fair.  Do you think relative or—.

Fair: I think it really depends on the whole situation.  I can’t say it is better for the child to be placed in a relative’s home that’s not necessarily permanent.

Simpson: But he said if they are equal.

Fair: You have to sit there and you have to look at everything involved.  You just can’t say yes or no.

Appellant stated, “All right.  Ms Shiro.”

Shiro: Me? . . . I keep going back and forth.  It is very hard for me to make a decision, because part of me thinks that they should go with a relative.  But then part of me thinks that they should have something more permanent.  So I really can’t make a decision.

Appellant replied, “Okay.  And, Mr. Culpepper.”

Before Culpepper could answer, the State objected, stating, “Judge, at this time we would object that he is contracting on an issue that’s not going to be submitted to the Jury.”  The trial court sustained the objection, and added, “Move on to something else.”  Appellant argued, “With regard to the action of the [State], I would say that they have a duty here to try and have a relative placement instead of going through foster care.  And I would like to be able to get into those issues.”  The trial court responded, “Argument in front of the Jury.  Sustain the objection.”
(footnote: 4)
Question 2

Appellant asked, “How many people believe that looking into the background of the foster home is important, also?” and then rephrased, on the request of a venireperson, “Is it important to look at the background of the foster home?”  The venire panel responded, “yes.”  Appellant then asked Question 2: “
How many foster kids do y’all think is, just this front row, a good number?  Too much?  Not enough?
” [Emphasis added.]

The State objected, “Object as to contracting as to how many children is appropriate, Judge.”  The trial court sustained the objection.  Appellant followed this question with, “[D]oes anyone believe that you can have too many foster kids in a home?”  The venire panel responded, “yes.”  Appellant then asked, “Does anyone believe that foster families should have as many kids as they want?”  The State’s attorney objected based on contracting, to which the trial court responded, “Let him finish the question.”
(footnote: 5)
Analysis

Voir dire’s primary purpose is to inquire about specific views that would prevent or substantially impair jurors from performing their duty in accordance with their instructions and oath, that is, to determine whether jurors are disqualified by statute.  
Vasquez
, 189 S.W.3d at 749-50
.  Section 62.105 of the government code sets out juror disqualifications for service in a particular case.  
Tex. Gov’t Code Ann. 
§ 62.105 (Vernon 2005).  Among other reasons, a person is disqualified to serve in a particular case if he or she has a bias or prejudice in favor of or against a party in the case.  
Id
. § 62.105(4).  Counsel’s broad latitude in voir dire is constrained by reasonable trial court control.  
Vasquez
, 189 S.W.3d 
at 750.  The trial court may place reasonable limits on questioning that is duplicative or a waste of time.  
Cortez ex rel. Estate of Puentes v. HCCI-San Antonio, Inc.
, 159 S.W.3d 87, 92 (Tex. 2005).

To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, if they are not apparent from the context of the request, objection, or motion.  
Tex. R. App. P. 
33.1(a); 
see also 
Tex. R. Evid
. 103(a)(1).  If a party fails to do this, error is not preserved, and the complaint is waived.  
Bushell v. Dean
, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh’g).  The objecting party must get a ruling from the trial court.  This ruling can be either express or implied.  
Frazier v. Yu
, 987 S.W.2d 607, 610 (Tex. App.—Fort Worth 1999, pet. denied).  To preserve a complaint that a trial court improperly restricted voir dire, a party must timely alert the trial court as to the specific manner in which it intends to pursue the inquiry.  
Vasquez
, 189 S.W.3d at 758.  Such a requirement provides the trial court with an opportunity to cure any error, obviating the need for later appellate review, and further allows an appellate court to examine the trial court’s decision in context to determine whether error exists, and if so, whether harm resulted.  
Id
.

With regard to Question 1, Appellant preserved error by explaining to the trial court the basis for the question and securing a ruling.  However, with regard to Question 2, Appellant provided no further explanation after the trial court sustained the State’s objection.  
Instead, she reworded questions on the same issue, and, although the State began to object, it did not complete its objection and the reworded questions were allowed.  Therefore, with regard to Question 2, Appellant has not preserved her complaint for our review.  
See
 
Tex. R. App. P
. 33.1(a); 
See Vasquez
, 189 S.W.3d at 758.

Appellant claims that Question 1 related to her ability to identify potential jurors who were biased against placement with relatives of an alleged abusive or neglectful parent and that this was directly related to her theory that termination was not in the children’s best interests because there were satisfactory options for placement with relatives that CPS had not adequately explored.  She claims that the trial court’s denial of her voir dire question impacted her ability to explore the case’s central issues and that she suffered harm thereby.

After an extensive review of the record, we conclude that even if  Question 1 was a proper voir dire question, the trial court did not abuse its discretion by sustaining the State’s objection and ending Appellant’s questioning on the pretrial placement issue.  By the time she asked Question 1, Appellant had already rephrased the question several times and had received considerable response and discussion by the venire panel.  It was within the trial court’s sound discretion to end this duplicative questioning and instruct Appellant to move on to another topic.  
See Cortez
, 159 S.W.3d at 92.  We overrule Appellant’s sole issue.

CONCLUSION

Having overruled Appellant’s sole issue, we affirm the trial court’s judgment.

PER CURIAM

PANEL F:  HOLMAN, DAUPHINOT, and GARDNER, JJ.

DELIVERED:  July 12, 2007

FOOTNOTES
1:
See 
Tex. R. App. P.
 47.4.

2:
Appellant was represented by counsel at trial.  Except where otherwise unclear, we refer to Appellant and her trial attorney as “Appellant.”

3:
Appellant asked, “So you are saying that if someone, whoever, had a drug or alcohol problem, were to take the stand, you would not be able to give their testimony as much weight?”  The State argued, “Object to contracting.  Judge, I believe once they start hearing information about somebody, such as if they were a drug user or something like that, if they are allowed to take that into consideration as far as their credibility—.”

4:
Throughout trial, Appellant solicited testimony about CPS and CASA’s decision-making process with regard to family placement, including who had been contacted and what they had been asked.  Appellant’s counsel admitted to the trial court, outside the jury’s presence, that he was trying to get to testimony about the review process with regard to whether there could have been a mistake in placement.  The State repeatedly objected on the basis that the issue was not before the jury and that the only issue was whether to terminate Appellant’s parental rights.

5:
Appellant asked, without objection from the State, “I was just trying to say, not everyone who agrees with me, just the people who disagree with the statement.  So how many people believe that there should be no limit to the amount of kids in the foster home? . . . Okay.”  The venire panel responded by show of hands.

During trial, the children’s foster parents testified that C.S. and C.R. had lived with them for sixteen months and that they wanted to adopt them. Appellant asked how many foster children were currently living with them.  They testified that they had six foster children, plus their natural child, in the four-bedroom home.  The foster mother testified that six was their personal limit for foster children, but that she did not know what the State’s limit was.