COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-08-333-CV

 

 

IN THE INTEREST OF A.M.S. 

AND L.N.S., CHILDREN

 

                                              ------------

 

           FROM
THE 323RD DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

Appellant
R.S. appeals from the trial court=s order
terminating his parental rights to his daughters A.M.S. and L.N.S.  Because we hold that the evidence is
factually sufficient to support the jury=s
endangerment findings and that any error was harmless, we affirm the trial
court=s
judgment terminating Appellant=s
parental rights to A.M.S. and L.N.S.

 

 








I.  Alleged hearsay is harmless, and evidence is
factually sufficient.

In his
first point, Appellant contends that the trial court erred by admitting
statements that L.N.S. made to two witnesses, a CPS investigator and a
therapist.  Even if the trial court erred
by admitting L.N.S.=s statements, which we do not
hold, Appellant cannot show harm.

To
obtain reversal of a judgment based upon an error in the trial court, the
appellant must show that the error occurred and that it probably caused
rendition of an improper judgment or probably prevented the appellant from
properly presenting the case to this court.[2]  We examine the entire record in making this
determination of harm.[3]









In his
fifth and sixth points, Appellant contends that the evidence is factually
insufficient to support the findings that he knowingly placed or allowed the
children to remain in conditions or surroundings which endangered their
physical or emotional well-being and engaged in conduct or knowingly placed the
children with persons who engaged in conduct which endangered the physical or
emotional well-being of the children.  Because we combine our sufficiency review with
our analysis of Appellant=s point complaining of evidentiary error,
we exclude the challenged statements by L.N.S. from our review.[4]

As we have
explained in a similar case, 

Endangerment means to expose to loss or injury, to
jeopardize.  The trial court may order
termination of the parent-child relationship if it finds by clear and
convincing evidence that the parent has knowingly placed or knowingly allowed
the child to remain in conditions or surroundings that endanger the physical or
emotional well-being of the child.  Under
subsection (D), it is necessary to examine evidence related to the environment
of the child to determine if the environment was the source of endangerment to
the child=s physical or emotional well-being.
Conduct of a parent in the home can create an environment that endangers the
physical and emotional well-being of a child.

 

. . . . 
Under subsection (E), the relevant inquiry is whether evidence exists
that the endangerment of the child=s physical or emotional well-being was the direct result of
the parent=s conduct, including acts,
omissions, and failures to act. 
Termination under subsection (E) must be based on more than a single act
or omission; a voluntary, deliberate, and conscious course of conduct by the
parent is required.

 








To support a finding of endangerment, the parent=s conduct does not necessarily have
to be directed at the child, and the child is not required to suffer
injury.  The specific danger to the child=s well-being may be inferred from
parental misconduct alone, and to determine whether termination is necessary,
courts may look to parental conduct both before and after the child=s birth.  . . . A parent=s decision to engage in illegal
drug use during the pendency of a termination suit, when the parent is at risk
of losing a child, supports a finding that the parent engaged in conduct that
endangered the child=s physical or emotional
well-being.  Thus, parental and caregiver
illegal drug use supports the conclusion that the children=s surroundings endanger their
physical or emotional well-being.  A
factfinder may also reasonably infer from a parent=s failure to attend scheduled drug
screenings that the parent was avoiding testing because the parent was using
drugs.  As a general rule, conduct that
subjects a child to a life of uncertainty and instability endangers the child=s physical and emotional
well-being.  

Because the evidence pertaining to subsections 161.001(1)(D)
and (E) is interrelated, we conduct a consolidated review.[5]

 

The jury heard the
following evidence, excluding the challenged statements of L.N.S.  A.M.S. tested positive for cocaine and
barbiturates at birth.  At the hospital,
M.F. (Mother) told Carnesha Collins, the CPS investigator, that she had used
cocaine throughout the pregnancy.  Mother
testified that she had used cocaine before and during her pregnancy with A.M.S.
and that Appellant had also used cocaine during that period.  Mother testified that Appellant had given her
the cocaine she used during the pregnancy and that he had used with her.  Appellant did not provide any cocaine to
Mother after A.M.S. was born.








Collins
testified that after she told Appellant about A.M.S. being born with cocaine in
her system, he said that he was not sure if he was her father and that he did
not care about her.

The
foster mother, Mrs. M., testified that A.M.S. has several medical
problems:  acid reflux, stomach problems,
bowel problems, allergies, and ear infections. 
Mrs. M. was told that because of the drugs, A.M.S.=s ear
canals did not form properly.

At the hospital
after A.M.S.=s birth, Mother also told Collins that she
was concerned about four-year-old L.N.S. and afraid for her safety because
L.N.S. was in Appellant=s care, and he drank alcoholCvodka and
grapefruit juiceCand did not properly care for her.








Collins
went to the Delux Inn off of Airport Freeway in Haltom City, where Mother had
said Appellant and L.N.S. were staying. 
Collins saw a little girl outside alone, waving at morning traffic.  That little girl was L.N.S.  Collins testified that after she woke
Appellant up and told him that L.N.S. was outside alone and advised him that
leaving L.N.S. outside alone with no one to adequately care for her was
neglectful supervision, he told her that L.N.S. was a big girl and that he was
not able to watch her every move. 
Appellant denied saying that; he testified that he told Collins that
L.N.S. was a big girl and that she sometimes opened the door without him
knowing it and that he had caught her and scolded her for it many times.  He also testified that he had told Collins
that he thought he had left L.N.S. with the girl next door with adult supervision
and that he had fallen asleep.  Collins
and Appellant=s counselor both testified that
he had not mentioned that version of the events to them.

Collins
saw trash in the hotel room, clothing on the floor, and cigarette butts
throughout the entire room, and the room smelled.  Collins saw no toys or clothes for L.N.S.,
and the room contained only one bed. 
Collins saw no food, except that among the trash on the floor, and no
refrigerator.  Appellant testified that
the room contained a refrigerator, a microwave, and food.

The
clothes L.N.S. wore were dirty, and the shoes she wore were too small.  She was hungry.  Collins could see that L.N.S. had severe
tooth decay.  Mother testified that a
dental appointment had been scheduled for L.N.S. around the time of the
removal, and she also testified that L.N.S. had a pediatrician whom she saw
regularly and that L.N.S. was current on her shots.  Mrs. M. testified that the dentist who saw
L.N.S. said that L.N.S. had baby bottle rot and that the dentist had to cap
twelve of her baby teeth.  Additionally,
Mrs. M. testified that L.N.S. was five shots behind when she tried to register
L.N.S. for school.








Mother
told Collins that she and Appellant were in an Aon and
off@
relationship, that she was very afraid of Appellant because he Aassault[ed]
her a lot,@ that she left L.N.S. with
Appellant because he would not allow her to keep L.N.S. or to place her with
someone other than Appellant, and that in addition to his frequent cocaine use,
he drank alcohol daily, used methamphetamine frequently, and used marihuana.  Mother testified that she had tried to leave
Appellant and take L.N.S. with her several times, but he always stopped her.

At the
first scheduled visit of the parents and children after the removal, Mother
told Collins that Appellant had threatened to harm Mother and that she had seen
him using crack cocaine with about twelve other people a day or two
earlier.  Collins smelled alcohol on
Appellant=s breath before the visit and
allowed the visit to take place, but she warned Appellant that he could not
show up again with alcohol on his breath or appearing to be under the
influence.

Appellant
did not take a drug test during the course of Collins=s
three-week investigation but did so later on the advice of counsel.  Appellant admitted to Collins that he used
marihuana.








Mother,
who signed an affidavit voluntarily relinquishing her parental rights,
testified that she did not believe that the children would be safe if returned
to Appellant because of his excessive drinking and belligerence.  She stated that he had been drinking on a
daily basis for about thirty or thirty-five years, starting when he was a
teenager.  Mother testified that he got Avery
ugly@ when he
drank and that he called her names like Acunt,@ Aslut,@ and Awhore
dog.@  She also testified that he could get Areal
aggressive@ when he drank and that he hit
her and pushed her, leaving bruises. 
Mother testified that L.N.S. Aobserved
the yelling, the cursing, [and] the pushing.@  Later, Mother stated that the physical
assaults occurred after the children=s
removal.  Mother testified that she
thought it was endangering for L.N.S. to be around when Mother and Appellant
had physical altercations and for her to hear the yelling and the language.

Mother
testified that Appellant=s most recent assault of her
happened a couple of weeks before trial; Appellant punched Mother in the
leg.  He also threatened to kill Mother
and the children during that episode. 
Within the four hours preceding her testimony, Mother testified,
Appellant had threatened to Ahunt
[her] down and kill@ her Aif he
los[t] the kids.@








The
foster father, Mr. M., also testified. 
He stated that he had known Appellant for several years, that Appellant
has had and still has an alcohol problem, and that Appellant had a severe drug
problem in the past.  As a result of his
alcohol problem, according to Mr. M., Appellant has poor judgment.  Mr. M. also testified that domestic violence
was part of Mother and Appellant=s
relationship even before CPS involvement. 
Mr. M. additionally testified that Mother had told him before that
Appellant sometimes got drugs for her.

In his
psychological evaluation, which was admitted into evidence, Appellant stated

$       
that he was once addicted to crack cocaine and that he started using
crack in 1993 but stopped on his own in 2003 with no relapses;

 

$       
that he used to sell and use amphetamines but has not used since 2000
and got tired of the people he had to deal with;

 

$       
that he was hooked on speed;

 

$       
that he had used marihuana every day from the time he was fifteen
years old until he was thirty years old and that he had quit because he got
tired of it (Appellant was forty-five years old at the time of the evaluation),
that he had last used marihuana in August 2007, four months before the
evaluation, at a party because it was there and his daughter was not;

 

$       
that CPS had not yet had him take a drug test;

 

$       
that he and a girlfriend used to drink a lot in the 1990s;

 

$       
that he had had a beer a few days earlier but before that had last had
alcohol in 2001;

 

$       
that he does not think that he has alcoholism and that he can quit
when he wants to;

 

$       
that he does not have a drinking problem anymore;

 

$       
that he had never had drug or alcohol treatment or a sponsor and never
attended Alcoholics Anonymous (AA) or Narcotics Anonymous (NA);

 

$       
that the girlfriend he used crack cocaine with in 1993 and he had had
domestic violence issues;








 

$       
that he had been arrested for five assaults, all alcohol-related:  one occurred when he and another man fought
in 1985; three occurred when he and a girlfriend fought in 1983; and one
occurred because Mother Asaid he hit her and the police
put him in jail@;

 

$       
that he had had Aa bunch@ of public intoxications
but that the last one was in the 1990s; and

 

$       
that when he used to drink, he drank very much and would get
aggressive. 

 

In
January 2008, soon after his psychological evaluation, Appellant submitted to a
hair follicle test and tested positive for cocaine.

James E.
Williams, Ph.D., Appellant=s
counselor, developed a treatment plan for Appellant that focused on anger
management and treating Appellant=s drug
problem and depression.  Appellant began
in November 2007, attended some sessions in December 2007 and January 2008, and
then stopped for three months before returning in late April and attending
through mid-June 2008.  While Appellant
successfully completed a set of twelve sessions of individual counseling, he
attended only three sessions of anger management and therefore did not complete
it successfully.  Williams testified that
Appellant needs anger management services Ain one
of the worst ways@ and that A[h]e
definitely needs more anger management.@  Williams stated that his concern at the time
of trial was Appellant=s allowing his emotions to
control him instead of controlling his emotions.








In one
individual session, Williams smelled an odor like alcohol on Appellant=s
breath.  Appellant stated that he had had
a few beers earlier.  At the time
Appellant stopped going to counseling, Williams felt that he was in further
need of substance abuse treatment. 
Overall, Williams opined that Appellant continues to need individual and
family counseling and anger management.

Cynthia
Frazier, from CATS, testified that Appellant had attended the Pine Street
residential rehabilitation program but had not completed an intake or taken
aftercare classes at CATS.  The CPS
caseworker confirmed that Appellant had completed the inpatient
twenty-eight-day program.








On April
15, 2008, after he completed the inpatient rehabilitation program, Appellant
was arrested on outstanding warrants.  He
and the police officer both testified that he was intoxicated at the time.  Additionally, Corporal Joe Portman testified
that on June 22, 2008, around 3:45 p.m., he saw Appellant and a female in a
motel parking lot on Highway 183 having some sort of confrontation.  The female told him that she was trying to
leave the motel, and Appellant followed her to the parking lot to try to stop
her.  She also said that Appellant was
intoxicated.  When Portman spoke to
Appellant, who was aggressive toward the female, the officer observed that
Appellant had red eyes and slurred speech and appeared to have a strong odor of
an alcoholic beverage on his breath. 
Appellant told the officer that he knew he was drunk and did not need to
take a sobriety test.  Appellant failed
the one-leg stand test, and Portman arrested him for public intoxication.  In the police car later, Appellant was
kicking and yelling.

Appellant
provided the CPS caseworker with the name of a sponsor only after several
months and admitted to her that he did not have regular contact with the sponsor.  The caseworker could never reach the sponsor.

Appellant
also provided his caseworker with a month=s worth
of sign-in sheets to show that he attended NA. 
She testified that she would have liked to have seen much more
consistent interaction and attendance at NA meetings and that it would have
been more beneficial for him to attend AA meetings.  She also testified that he was encouraged to
go to CATS for aftercare but that he did not attend.

The
caseworker testified that at the time of trial, Appellant continued to need
treatment because of his alcohol-involved relapses and arrests after inpatient
treatment, and she also testified that he had not followed through with any
aftercare, AA, or NA since May 2008.  








She also
testified that the drug and alcohol abuse were still a concern for her because
of his June 2008 arrest, and she stated that she felt Athat
that=s a way
that [Appellant] is able to get through day-to-day life, just by drinking and
maybe thinking that that will take away a lot of the things that he=s faced
with.@

The
caseworker testified that a child would be at Avery
much risk@ if parented by someone who was
drinking alcohol.  She stated that the
parent=s
judgment would be impaired, the parent=s
decision-making skills would be poor, and the child could be exposed to alcohol
and drink it himself.  She also said that
it is not safe for a child to be parented by someone who drinks all day and
that she did not see any way that such a parent could take care of the child=s needs.

The CPS
caseworker admitted that Appellant had taken three drug tests since he
completed inpatient treatment and that they were all negative.  They did not, however, test for alcohol.

The CPS
caseworker also testified that she was concerned about Appellant=s anger
issues and did not believe that he had made any significant progress on being
able to control or better manage his anger. 
The caseworker testified that if Appellant were to get the children back
with no one to help him and no other target for his anger, she would be
concerned whether he would take his anger out on the children.








Mrs. M.
testified that she had known the birth parents for several years.  She testified that 99% of the time that she
had seen Appellant, he had been drinking. 
She also stated that she had seen him drinking and driving with L.N.S.
in the vehicle.  She testified that his
drinking is one of her main concerns should the children be returned to the
birth parents.  She spoke of an occasion
about a year or so before the filing of the case at bar when Appellant had
arrived at her home, intoxicated and unsteady on his feet, carrying L.N.S., who
was filthy and had no coat or shoes even though it was winter.  Appellant testified that he had taken L.N.S.
from her godmother=s house with the support of the
police and CPS and that there had been so much chaos there that he just grabbed
her and left and went straight to the home of the now foster parents.

Mrs. M.
also testified that Appellant told Mother at that time that he had taken L.N.S.
to the graveyard and had told the little girl Athat
that was where her dead mother was.@  Appellant testified that he had taken her to
his mother=s grave because L.N.S. had never
met her paternal grandmother and that he had never told L.N.S. that Mother was
dead.

Appellant
admitted that he used drugs after the removal and that he tested positive for
drugs in January 2008.  He also testified
that he did not remember getting anything regarding CATS but that he had gone
to meetings at the Bill Gregory Center, that he had an AA sponsor, and that he
had been attending NA meetings.  He
explained that he had not completed anger counseling because of work but stated
that he did make an effort.








There
was also evidence that Appellant did not have stable housing and had not had
stable housing for a very long time. 
Mother said that they lived from place to place.  Appellant moved from the Delux Inn after the
first visitation.  He testified that he
lived with his father in Millsap in Parker County at the time of trial but that
the home was not a permanent solution and that he also kept a hotel room near
his work in Haltom City.  The caseworker
testified that A[i]t=s just
not healthy for a child to live in a C from
motel to motel, for a child not to be able to grow up with that structure and
stability in their lifestyle.@  

As
Collins transported L.N.S. away from the motel during the removal, L.N.S.
lowered her voice when discussing Appellant. 
Collins was concerned after this interaction and sent L.N.S. for a
forensic interview.  Collins explained at
trial that A[i]f [CPS] get[s] to a certain
point with a child that severe outcries are made, we send them to a specialist
that would be more in-depth.@  During the forensic interview, Collins
testified, L.N.S. made an outcry of sexual abuse.

Mother
had indicated to Collins that she was concerned that sexual abuse had occurred
because she witnessed L.N.S. inserting Barbie dolls into her vagina.








Mrs. M.
testified that she had observed sexual acting out by L.N.S. after the children
were placed with her and her husband. 
Mrs. M. testified that when L.N.S. was first placed with her, and men
who were strangers to the child visited, L.N.S. would Aautomatically
go up to these gentlemen when they were sitting, sit on their lap, rub their
stomach and chest and face, and the way she was doing it was like a wife would
do her husband.@

Mrs. M.
said that she put L.N.S. in the bath with her Barbie dolls to play with, and
when Mrs. M. went back to check on L.N.S.,

she was inserting the legs [of the dolls] into her vagina.  She has played with herself in front of my
daughter and my nephew, and she was outside, and we have a rail.  She was hunching the rail.

 

. . . .

 

[Mrs. M. explained that the phrase meant] [g]oing up and down on the
rail with her legs.  I caught her doing
the same thing to the dogs, and that concerned me, because that wasn=t proper behavior for a
five-year-old, and I knew something was wrong.@

 








Appellant
denied having touched L.N.S. inappropriately and denied ever touching her with
an intent to gratify sexual desire. 
Appellant testified that he had been convicted of assaulting Mother when
L.N.S. was young and had served eleven months in jail (he denied committing the
assault).  He testified that before he
began to serve his sentence for assaulting Mother, he placed L.N.S. with a
godmother because Mother, who was in and out of the home and had mental illness
and drug issues, was not capable of caring for her.  A few months after his release, Appellant
regained custody of L.N.S., and a month later, Mother began living with him and
L.N.S.  

Appellant
stated that he noticed concerning behaviors of L.N.S. and that Mother told him Astuff
that [L.N.S.] was doing when [Mother] was giving her baths@ that
had not occurred before he had left the child with the godmother. Appellant
testified that he reported his suspicions to CPS and the police.  He said that CPS made him and Mother take a
drug test and that he never heard anything else from them.  He also testified that L.N.S.=s
concerning behaviors subsided and that he never witnessed them.  The CPS caseworker testified that a
computerized record would have been created had there been any such calls to
CPS and that no record existed.

The CPS
caseworker testified that A[t]here
[was] no doubt in [her] mind@ that
L.N.S. had been sexually abused.  But the
caseworker also testified that no criminal charges had been brought against
Appellant related to any alleged sexual abuse. 
Finally, the caseworker also testified that L.N.S.=s
behaviors are a manifestation of the abuse and neglect she has suffered.








Applying
the appropriate standard of review[6]
but ignoring L.N.S.=s statements, we hold that the
evidence is factually sufficient to support the endangerment findings.  We overrule Appellant=s fifth
and sixth points.    Because we hold the
evidence factually sufficient without considering L.N.S.=s
challenged statements, we consequently hold that the error, if any, in their
admission was harmless.[7]  We overrule Appellant=s first
point.

II.  Any jury charge error is harmless.








In his
second point, Appellant contends that the trial court erred by including
questions in the jury charge that applied to the children collectively instead
of submitting a separate set of questions for each individual child.  In his third point, Appellant contends that
the trial court erred by failing to submit the cause upon broad-form
questions.  While the State argues that
Appellant abandoned or failed to get a ruling on these objections below, we are
not prepared to hold that the trial court=s ruling
at the end of the charge conferenceCAAll
right.  I=ll deny
your objection.  So other than the
objection that you just mentioned, everything else is all right?@ C
pertained only to the last of three objections argued by Appellant instead of
to all three objections argued, nor do we hold that Appellant=s reply,
AWe have
no other objections, Your Honor,@ somehow
abandoned his already clearly voiced objections.  Based on our review of the record, we hold
that Appellant=s objections to the jury charge
were properly preserved.

We also
hold that the trial court abused its discretion by failing to charge the jury
separately regarding the termination of Appellant=s
parental rights to each child.[8]  That is, the jury should have been asked to
separately determine (1) whether the parent-child relationship between
Appellant and L.N.S. should be terminated and (2) whether the parent-child
relationship between Appellant and A.M.S. should be terminated.[9]  








On the
issue of harm, Appellant argues that because A.M.S. never lived with him and
all his time with her was supervised, there is no evidence that he caused
impairment or injury to her physical or emotional well-being. However, evidence
that Appellant endangered L.N.S. can be used to prove endangerment to A.M.S.
and vice versa; further, evidence that he gave Mother cocaine during her
pregnancy with A.M.S. is evidence of endangerment.[10]  Given the state of the entire record, we
conclude that this charge error was harmless.[11]  We overrule Appellant=s second
point.

In his
third point, Appellant complains that the trial court abused its discretion by
not submitting broad-form questions to the jury.  Appellant, however, does not allege harm, nor
do we see any.  We overrule his third
point.

In his
fourth point, Appellant contends that the trial court erred by including in the
jury charge statements that endanger means Ato
expose to loss or injury; to jeopardize@ and
that A[i]t is
not necessary that the conduct be directed at the child or that the child
actually suffers the injury.@  For the reasons expressed by our sister court
in Amarillo,[12]
we hold that the trial court did not abuse its discretion by including these
definitions and not others in the jury charge. 
We overrule Appellant=s fourth
point.

 

 

 

 

 








III.  Conclusion

Having
overruled all of Appellant=s
points, we affirm the trial court=s
judgment.

 

 

LEE ANN DAUPHINOT

JUSTICE

 

PANEL:  LIVINGSTON, DAUPHINOT, and GARDNER, JJ.

DELIVERED:  December 10, 2009











[1]See Tex. R. App. P. 47.4.





[2]Tex. R. App. P. 44.1(a); Romero
v. KPH Consolidation, Inc., 166 S.W.3d 212, 225 (Tex. 2005).





[3]Interstate Northborough P=ship v. State, 66 S.W.3d 213, 220
(Tex. 2001).





[4]See, e.g., N. Dallas
Diagnostic Ctr. v. Dewberry, 900 S.W.2d 90, 97 (Tex. App.CDallas 1995, writ denied) (refusing to consider
evidence held inadmissible in factual sufficiency review).





[5]In re J.W., No. 02-08-00211-CV,
2009 WL 806865, at *4B5 (Tex. App.CFort Worth Mar. 26, 2009,
no pet.) (mem. op.) (citations omitted); see also In re J.O.A., 283
S.W.3d 336, 345B46 (Tex. 2009).





[6]See In re H.R.M., 209
S.W.3d 105, 108 (Tex. 2006); In re C.H., 89 S.W.3d 17, 28 (Tex. 2002).





[7]See Tex. R. App. P. 44.1(a);
Romero, 166 S.W.3d at 225.





[8]See Tex. Dep=t of Human Servs. v. E.B., 802 S.W.2d 647, 648
(Tex. 1990) (approving separate broad-form question for each child); In re
J.M.M., 80 S.W.3d 232, 245, 250 (Tex. App.CFort Worth 2002, pet.
denied) (same), disapproved of on other grounds by In re J.F.C.,
96 S.W.3d 256, 267 (Tex. 2002).





[9]See E.B., 802 S.W.2d at 648; J.M.M.,
80 S.W.3d at 245, 250; see also Comm. on Pattern Jury Charges, State Bar
of Tex., Texas Pattern Jury Charges: Family 185B88 & cmt. (2008).





[10]See J.W., 2009 WL
806865, at *4B5.





[11]See Tex. R. App. P. 44.1(a);
Romero, 166 S.W.3d at 225.





[12]In re C.J.F., 134 S.W.3d 343, 355 (Tex.
App.CAmarillo 2003, pet.
denied) (upholding substantially same instruction).